IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Harold D. Strong,<br><br>    Plaintiff,<br><br>vs.<br><br>Progressive Roofing Services,,<br><br>    Defendant. | No. 05-1023-PHX-EHC<br><br>**ORDER** |

Before the Court are Defendant's Motion for Summary Judgment (Dkt. 21), Plaintiff's Cross-Motion for Summary Judgment (Dkts. 35, 36), and Plaintiff's Motion to Appoint Counsel (Dkt. 31). For the reasons discussed herein Defendant's Motion for Summary Judgment (Dkt. 21) is granted, Plaintiff's Cross-Motion for Summary Judgment (Dkts. 35, 36) is denied, and Plaintiff's Motion to Appoint Counsel (Dkt. 31) is denied.

**I.  Background**

This employment action stems from two alleged acts by Defendant, Progressive Roofing Services. Plaintiff is an African-American who began work for Defendant, a roofing company, in July 1997. (Dkt. 42, ¶¶ 4, 5). Plaintiff alleges that he should have been selected for a promotion to the position of Safety Coordinator in August 2004, but was denied that position because of his race. (Dkt. 4, ¶ 6) Plaintiff further alleges that Defendant discharged him in retaliation for speaking with a superior. (Dkt. 4, ¶ 16).

### A.     Failure to Promote to Position of Safety Coordinator

The position of Safety Coordinator became vacant in July 2004, when the incumbent Safety Coordinator passed away. (Dkt. 42, ¶ 12; Def. Stat. of Undisputed Facts ("DSOF") ¶ 6). One of the requirements of the job of Safety Coordinator is that the person be fluent in Spanish, and the job description for the Safety Coordinator position states that the position requires Spanish fluency. (DSOF ¶ 1; Plaintiff's Opp. Statement of Facts ("PSOF") ¶ 1). Many of Defendant's employees have limited English-language ability and have much better communication ability in Spanish than in English. (DSOF ¶¶ 4, 11; PSOF ¶ 4). In order to promote safety, Defendant desired to make sure that employees had the best understanding of safety rules and safety equipment. (DSOF ¶ 3; PSOF ¶ 3). It was therefore in Defendant's best interest to communicate safety information in Spanish to employees whose comprehension ability is better in Spanish. (DSOF ¶ 5, PSOF ¶ 5). The incumbent Safety Coordinator who passed away was bilingual and most of Defendant's foreman speak Spanish and English. (DSOF ¶¶ 6, 13; PSOF ¶¶ 6, 13).

Although Plaintiff claims to have submitted an application for the position of Safety Coordinator, Defendant denies having received any application from Plaintiff. (DSOF ¶ 17; PSOF ¶ 17). Plaintiff and Defendant agree, however, that Plaintiff told Defendant's Human Resources Director that he spoke only a little Spanish. (DSOF ¶ 21; PSOF ¶ 21). Plaintiff also admits that he has never described himself as being "fluent in Spanish," and he does not dispute that he told at least four other employees, including the Safety Director, the Human Resource Specialist, and the Human Resources Manager, that he spoke "a little Spanish." (DSOF ¶ 23; PSOF ¶ 23). Plaintiff claims that Defendant wrongfully rejected his application for the position of Safety Coordinator based upon his race.[1]

---

[1] Plaintiff alleges in his Statement of Facts in Support of his Cross-Motion for Summary Judgment that "[D]efendant rejected plaintiff's application for employment before receiving any applications for position of safety coordinator from any other person." (Dkt. 37, ¶ 14). Nonetheless, Plaintiff has not cited to any facts supporting this contention nor has he pointed to any other facts demonstrating that his alleged application was rejected.

- 2 -

**B.     Alleged Wrongful Discharge**

Plaintiff also alleges in his complaint that he was discharged in retaliation for speaking to a "superintendent." (Dkt. 4, ¶ 16). Defendant, on the other hand, argues that Plaintiff was discharged because of his repeated violation of Defendant's rules and regulations. (Dkt. 21, p. 5). Plaintiff had signed an acknowledgment when he started work that his employment was at-will and that he would abide by Defendant's rules and regulations. (DSOF ¶ 46; PSOF ¶ 47).

Defendant's policies allowed some workers to take a company pick-up truck home, provided that the company vehicle would be used only to drive back and forth to work, and not be used for personal purposes. (DSOF ¶ 25; PSOF ¶ 25). Plaintiff violated this policy when he got into an accident in the parking lot of a restaurant on Sunday, January 25, 2004, a day that he concedes he was not working. (DSOF ¶ 26; PSOF ¶ 26). Defendant also maintained a system whereby some workers were provided with a company credit card and pin number to use for purchasing gas. (DSOF ¶ 28; PSOF ¶ 28). The credit card was supposed to stay with the vehicle, and the pin numbers enabled Defendant to track the particular employee who purchased gas at a particular time. (DSOF ¶ 28; PSOF ¶ 28). Defendant's policies prohibited credit card abuse, including using the company credit card to buy gas for personal use. (DSOF ¶ 29; PSOF ¶ 29). Defendant's rules and regulations included a section on credit card abuse that specifically warned employees that "the practice of fueling or allowing to fuel personal vehicles...with credit cards owned by [Defendant]" was prohibited. (DSOF ¶ 34, Ex. 3).

On July 8, 2004, Defendant issued a written Employee Warning Notice to Plaintiff for purchasing gas using a company credit card and his pin number on July 4, 2004. (DSOF ¶ 30; PSOF ¶ 30). Plaintiff does not dispute that July 4, 2004, was not a work day, and that he was not working that day. (DSOF ¶ 31; PSOF ¶ 31). Later, in October 2004, Defendant reviewed gasoline purchases. (DSOF ¶ 35). Defendant compared the date and time that Plaintiff's credit card and pin number were used to purchase gas against the times and dates that Plaintiff worked. (DSOF ¶ 36; PSOF ¶ 36). Defendant discovered a pattern of gasoline

- 3 -

1 purchases during days that Plaintiff did not work or outside of working hours on days that
2 Plaintiff did work.  (DSOF ¶ 37; PSOF ¶ 37).  Plaintiff claimed to have receipts or notes
3 reflecting that the purchases were for business purposes, but never produced these to
4 Defendant.  (DSOF ¶¶ 39-40). Rather, Plaintiff testified that the receipts "disintegrate[d] in
5 no time," and that after the "ink [wore] off of them" he "end[ed] up with a pile of blank
6 papers."  (DSOF ¶ 41; Strong Dep. 147:4-148:10).  Plaintiff was not driving a company-
7 owned vehicle home during the time period in question.  (DSOF ¶ 44; PSOF ¶ 44). Plaintiff
8 does not dispute the accuracy of Defendant's time records showing the times that he was
9 working.  (DSOF ¶ 43; PSOF ¶ 43).

## II.    Summary Judgment Standard

Summary judgment is appropriate "when there is no genuine issue of material fact" such that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*). In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the nonmoving party.  Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995).  All reasonable inferences are drawn in favor of the nonmovant. Gibson v. County of Washoe, 290 F.3d 1175, 1180 (9th Cir. 2002).  If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

If the moving party presents evidence that, taken by itself, would establish the right to a directed verdict at trial, the motion for summary judgment must be granted in the absence of any significant probative evidence tending to support the opposing party's theory of the case. First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968); THI-Hawaii, Inc.

v. First Commerce Fin. Corp., 627 F.2d 991, 993-94 (9th Cir. 1980). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial. Anderson, 477 U.S. at 249; Devereaux, 263 F.3d at 1076. A factual dispute is genuine if the evidence is such that a rational trier of fact could resolve the dispute in favor of the nonmoving party. Anderson, 477 U.S. at 248. A fact is material if determination of the issue might affect the outcome of the case under the governing substantive law. Anderson, 477 U.S. at 248. Thus, a party opposing a motion for summary judgment cannot rest upon bare allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party's evidence is merely colorable or not significantly probative, a court may grant summary judgment. See Anderson, 477 U.S. at 249; see also Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, 818 F.2d 1466, 1468 (9th Cir. 1987).

**III.    Defendant's Title VII Claim for Failure to Promote**

    **A.    Disparate Treatment Analysis**

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin." Pub. L. 88-352, § 704, 78 Stat. 257, as amended, 42 U.S.C.§ 2000e-2(a). Burlington Northern & Santa Fe Ry. v. White, 126 S.Ct. 2405, 2408 (2006). To set forth a prima facie case of discrimination under a "failure to promote" theory, Plaintiff must demonstrate (1) that he belongs to a racial minority; (2) that he applied and was qualified for the job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons with Plaintiff's qualifications. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Defendant argues that Plaintiff cannot establish a prima facie case of discrimination under Title VII because he has provided no evidence that he was qualified for the job of

1  Safety Coordinator. Specifically, Defendant argues that Plaintiff is not fluent in Spanish.
2  (Dkt. 21). It is undisputed that fluency in Spanish was one of qualifications required for the
3  job of Safety Coordinator. (Dkt. 21). The job description for the Safety Coordinator position
4  states that the position requires Spanish fluency. (DSOF ¶ 1; PSOF ¶ 1). Plaintiff admits in
5  his complaint that he is not fluent in Spanish, but asserts that he does "however speak a little
6  Spanish." (Dkt. 4, ¶ 11). Plaintiff also does not dispute that he told Defendant's Human
7  Resource Director, that he "spoke only a little Spanish." (PSOF ¶ 21). Because Plaintiff
8  admits in his complaint that he is not fluent in Spanish, and the undisputed facts in the record
9  demonstrate that Plaintiff is not fluent, the Court can only infer that Plaintiff was not fluent
10 in Spanish.

11 Thus, Plaintiff cannot prove a critical element of his prima facie case; that he was
12 qualified for the position of Safety Coordinator. See McDonnell Douglas, 411 U.S. at 802
13 (the plaintiff must demonstrate that he applied for the position *and was qualified*). Plaintiff's
14 argument that he speaks "a little Spanish" does not raise a triable issue of fact as to whether
15 Plaintiff met the qualifications of being *fluent* in Spanish.[2] See Anderson, 477 U.S. at 248
16 (a factual dispute is genuine if the evidence is such that a rational trier of fact could resolve
17 the dispute in favor of the nonmoving party).

---

[2] Further discovery on the issue of "fluency" would not be fruitful in light of Plaintiff's allegations in his complaint that he only speaks a little Spanish. (Dkts. 35, 36). Plaintiff further agrees in his Opposition Statement (Dkt. 38) that he is "not fluent by 'defendants' definition of the word[,]" although he adds that Defendant defines "fluent" as "Hispanic/Latino." (PSOF ¶ 23). Plaintiff does not point to any facts supporting this allegation. Even if he had, this allegation goes to *pretext* and not the issue of qualification, which is required as part of his prima facie case. As other courts have noted, it is not the task of the Court to scour the record in search of a genuine issues of triable fact. See Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). The Court relies on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment. Keenan, 91 F.3d at 1279. Thus, Plaintiff cannot rest upon a bare allegation that Defendant was using a different definition of the word "fluent," but must set forth specific facts demonstrating that there is genuine issue regarding interpretation for trial. Anderson, 477 U.S. at 250. Moreover, Plaintiff concedes in his Cross-Motion for Summary Judgment that "no genuine issues of material facts [*sic*] exist." (Dkts. 35, 36).

### B. Disparate Impact Analysis

Even though Plaintiff has failed to put forth any facts demonstrating that he was qualified for the position of Safety Coordinator, the Court must further analyze whether the qualifications themselves had disparate impact on a protected group. In enacting Title VII, Congress required "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." See Dothard v. Rawlinson, 433 U.S. 321, 328, 97 S.Ct. 2720 (1977) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849 (1971)). Thus, to succeed on a disparate impact theory, Plaintiff need not show that Defendant intended to discriminate against him. He need only prove that a facially neutral employment practice, i.e. the requirement that Safety Coordinator speak fluent Spanish, has had a "significantly discriminatory" impact upon a group protected by Title VII. See Paige v. California, 291 F.3d 1141, 1144 (9th Cir. 2002) (quoting Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 481 (9th Cir. 1983). To prevail, Plaintiff must present statistical evidence demonstrating that a particular practice causes a protected minority group to be underrepresented in a specific area of employment, and Plaintiff's statistical analysis must show a disparity that is "sufficiently substantial" as to "raise an inference of causation." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994, 108 S.Ct. 2777 (1988).

Congress passed the Civil Rights Act of 1991 partly in response to Supreme Court case law that had largely shifted the burden of proving disparate impact from employers to the disparate-impact plaintiffs. See Association of Mexican-American Educators v. California, 937 F. Supp. 1397, 1405 (N.D. Cal. 1996) (discussing the effect of Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 104 L. Ed. 2d 733, 109 S. Ct. 2115 (1989)). The Civil Rights Act of 1991 provides, in relevant part, that:

An unlawful employment practice based on disparate impact is established...only if:

> (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the

- 7 -

|   |   |
|---|---|
| 1 | challenged practice is job related for the position in question and consistent with business necessity; or |
| 2 | |
| 3 | (ii) the complaining party [makes a showing of] an alternative employment practice and the respondent refuses to adopt such alternative employment practice. |

42 U.S.C. § 2000e-2(k)(1)(A).

Plaintiff argues that the requirement that Safety Coordinator be fluent in Spanish causes a disparate impact on his class, i.e. African-Americans. (Dkts. 35, 36). Plaintiff, however, presents little, if any, statistical evidence to support his claim. For instance Plaintiff points to Defendant's Answer, which states that 70-80% of its workforce is "comprised of employees who are Spanish-speaking," many of whom are "native Spanish speakers." (Dkt. 5, ¶ 6). This, however, does not indicate that the requirement of Spanish fluency causes a disparate impact on African-Americans. Plaintiff also argues that "[Defendant] has never hired an Afro-American for the position of safety coordinator." (Dkt. 37, ¶ 13). While Plaintiff does not dispute this fact, it responds "that the Safety Coordinator position has been filled by only two individuals in the Company's history. The Company does not inquire or keep records regarding the ethnicity or race of employees, but neither Safety Coordinator is believed to be African-American."(Dkt. 42, ¶ 13). Plaintiff does not offer any contradictory evidence. The little evidence presented is not "sufficiently substantial" as to "raise an inference of causation" between the requirement of Spanish fluency and the fact that no African-Americans have ever held the Safety Coordinator position, especially when there have only been two prior Safety Coordinators in this history

- 8 -

of the position.³ See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994, 108 S.Ct. 2777 (1988).

In addition, the undisputed evidence demonstrates that the requirement of Spanish fluency is "job related for the position in question" and "consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A). The evidence demonstrates that Defendant was committed to maintaining a safe workplace, (DSOF ¶ 2), and in order to promote safety, Defendant wanted to make sure that employees had the best understanding of safety rules and safety equipment. (DSOF ¶ 3). Many of Defendant's employees have limited English-language ability, and it is in the interest of Defendant to communicate with them. (DSOF ¶¶ 4, 11; PSOF ¶ 4). It is in Defendant's interest to communicate safety information in Spanish to employees whose comprehension ability is better in Spanish, (DSOF ¶ 5), and the incumbent Safety Coordinator who passed away, creating the vacancy at issue, was bilingual in English and Spanish. (DSOF ¶ 6). Plaintiff disputes that it is "particularly important that the Safety Coordinator speak Spanish," arguing that the person who holds the position of Safety Director (an entirely different position) is not fluent in Spanish. (DSOF ¶ 14). Plaintiff does not point to any facts in the record supporting this statement, and it is not clear that this fact would support his argument even if substantiated.⁴

---

³The Court also questions whether such evidence even qualifies as "statistical." Webster's defines "statistics" as "facts or data of a numerical kind, assembled, classified, and tabulated so as to present significant information about a given subject." Webster's New World Dictionary, Third College Edition. Thus, "statistical" means "having to do with, consisting of, or based on statistics." Id. Plaintiff presents no significant information for the Court to consider. See Anderson, 477 U.S. at 249; (if the nonmoving party's evidence is merely colorable or not significantly probative, a court may grant summary judgment).

⁴Plaintiff also argues that Defendant's reasons for requiring Spanish fluency by the Safety Coordinator do not explain why "the Safety Coordinator was the only position in the company that an Afro-American was applying for, has fluent [*sic*] as a requirement." (Dkts. 5, 6). This argument, however, goes to Plaintiff's theory that the requirement of Spanish fluency was a pretext for discrimination aimed at Plaintiff directly, not a facially neutral requirement having a "significantly discriminatory" impact upon African-Americans. See Paige, 291 F.3d at 1144; *cf.* McDonnell Douglas Corp., 411 U.S. 802 (only if Plaintiff first

1    Accordingly, Defendant's Motion for Summary Judgment (Dkt. 41) is granted as to
2 Plaintiff's Title VII claim involving the failure of Defendant to promote him to the position
3 of Safety Coordinator. The undisputed evidence demonstrates that Plaintiff is not fluent in
4 Spanish, and thus, was not qualified for the Safety Coordinator position.[5] Moreover, Plaintiff
5 has not provided any statistical evidence supporting his disparate impact theory and the
6 undisputed evidence in the record is not sufficiently substantial as to raise an inference of
7 causation.

**IV.     Plaintiff's Title VII Claim Regarding His Discharge**

        **1.     Retaliation Analysis**

Plaintiff's complaint alleges: "[a]fter speaking to another superintendent, I was [retaliated] against by roofing company, resulting in my termination." (Dkt. 4, ¶ 16) (brackets in original). A section of Title VII, commonly known as the "anti-retaliation provision," forbids an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation.

---

makes a prima facie case, does the burden shift to the employer to articulate a legitimate, nondiscriminatory reason for the employee's rejection). As discussed, supra, Plaintiff has failed to set forth a prima facie case of discriminatory intent under McDonnell Douglas, and thus, the Court need not consider whether the requirement for fluency was a pretext for a discriminatory motive against Plaintiff.

[5]Defendant, concedes that a genuine issue of fact exists as to whether or not Plaintiff actually applied for the Safety Coordinator position (Dkt. 21). Plaintiff must prove that he applied for the position as part of his prima facie case. See McDonnell Douglas Corp., 411 U.S. at 802. Defendant claims that it did not receive an application from Plaintiff for the position of Safety Coordinator, (DSOF ¶ 17), but Plaintiff insists that they "did receive an application" from him, which he "submitted in a company lock box, for applications." (PSOF ¶17). Plaintiff, however, does not cite any facts supporting his claim that he submitted an application in a company lock box and the Court is not required to scour the record. See Keenan, 91 F.3d at 1279. Nonetheless, Plaintiff was not qualified at the time he claims to have applied because it is undisputed that he was not fluent in Spanish. Thus, this dispute is not material because Plaintiff has failed to present other necessary aspects of his prima facie case. See Anderson, 477 U.S. at 248 (a fact is material if determination of the issue might affect the outcome of the case under the governing substantive law).

- 10 -

§ 2000e-3(a). Burlington Northern & Santa Fe Ry. v. White, 126 S.Ct. 2405, 2408 (2006). To establish a claim for retaliation, Plaintiff must demonstrate: (1) involvement in a protected activity; (2) an adverse employment action (or "challenged action")[6]; and (3) causal link between the two. Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000). If Plaintiff makes a prima facie case, the burden then shifts to Defendant "to articulate a legitimate, non-discriminatory reason for the adverse employment action." Brooks, 229 F.3d at 928. If the employer articulates such a reason, the burden then shifts back to plaintiff to "demonstrat[e] that the reason was merely a pretext for a discriminatory motive." Brooks, 229 F.3d at 928. Only then does the case proceed beyond the summary judgment stage. Brooks, 229 F.3d at 928.

Plaintiff has put forth no evidence that he engaged in a protected activity. The only arguable reference to any protected activity is the allegation in Plaintiff's complaint that he spoke to a "superintendent." (Dkt. 4, ¶ 16). Nonetheless, Plaintiff does not state what he spoke to the superintendent about and does not offer any facts supporting this allegation. In opposing Defendant's motion for summary judgment, Plaintiff cannot rest upon bare allegations or denials in his pleadings, but must set forth specific facts demonstrating a genuine issue for trial. See Anderson, 477 U.S. at 250. Because Plaintiff has failed to set forth specific facts demonstrating he engaged in Title VII protected activity prior to his termination, he cannot make a prima facie showing of retaliation. Brooks, 229 F.3d at 928. Thus, Plaintiff's retaliation claim fails as a matter of law, and there is no need to inquire into whether Defendant had legitimate nondiscriminatory reasons for discharging Plaintiff.[7] See Brooks, 229 F.3d at 928.

---

[6] In White, the Court used the term "challenged action" instead of "adverse employment action," because Title VII's anti-retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." White, 126 S.Ct. at 2412-13. Title VII also protects employees from retaliation in the form of "actions not directly related to [the] employment" and "harm outside the workplace." Id. at 2412.

[7] The Court finds in the next section of this opinion that Defendant did have legitimate nondiscriminatory reasons for discharging Plaintiff.

### B.     Disparate Treatment in Discharge Analysis[8]

The McDonnell Douglas standards are adaptable to different factual situations. To make a prima facie showing of discriminatory discharge using the McDonnel Douglas framework, Plaintiff must show (1) that he was within a protected class; (2) that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance; and (3) that his employer sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills. See Sengupta v. Morrison-Knudsen Co., 804 F.2d 1072, 1075 (9th Cir. 1986).

Defendant argues that Plaintiff was discharged because of his repeated violation of Defendant's policy that prohibited purchasing gas with a company credit card when he was not working. (Dkt. 21, p. 5). Defendant's rules and regulations included a section on credit card abuse that specifically warned employees that "the practice of fueling or allowing to fuel personal vehicles...with credit cards owned by [Defendant]" was prohibited. (DSOF ¶ 34, Ex. 3). On July 8, 2004, Defendant issued a written Employee Warning Notice to Plaintiff for purchasing gas using a company credit card and his pin number on July 4, 2004. (DSOF ¶ 30). Plaintiff does not dispute that July 4, 2004, was not a work day, and that he was not working that day. (DSOF ¶ 31). During his deposition, Plaintiff refused to answer any questions regarding whether he did, in fact, use Defendant's company credit card to purchase gasoline for personal use on July 4, 2004, asserting his Fifth Amendment right against self-incrimination. In civil cases, the Court may draw an adverse inference "when silence is countered by independent evidence of the fact being questioned[.]" See Doe by & Through Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1264 (9th Cir. 2000). Because Defendant has presented independent evidence that Plaintiff used the company credit card to purchase

---

[8]Plaintiff has not produced statistical evidence that Defendant's credit card usage policy had a disparate impact on African-Americans. Thus, the Court analyzes his claim under the McDonnell Douglas disparate treatment framework. To the extent that Plaintiff is claiming disparate impact by Defendant's credit card usage policies, that claim is without supporting evidence in the record and will not survive Defendant's instant Motion for Summary Judgment.

gasoline for personal use on July 4, 2004, the Court will draw an adverse inference from Plaintiff's refusal to answer questions regarding that subject during his deposition. (DSOF ¶ 31). Thus, the Court infers that Plaintiff did use the company credit card for personal purchases on July 4, 2004, in violation of Defendant's policies.

Defendant later reviewed gasoline purchases in October 2004, and found a pattern of gasoline purchases by Plaintiff during times that he was not working. (DSOF ¶¶ 35-38). Plaintiff claimed to have receipts or notes reflecting that the purchases were for business purposes, but never produced these to Defendant. (DSOF ¶¶ 39-40). Rather, Plaintiff testified that the receipts "disintegrate[d] in no time," and that after the "ink [wore] off of them" he "end[ed] up with a pile of blank papers." (DSOF ¶ 41; Strong Dep. 147:4-148:10). Plaintiff has not pointed to any other evidence that would suggest the purchases discovered by Defendant were for business purposes. Plaintiff also does not dispute that his employment was at-will and that he had signed an acknowledgment that he had received and would abide by Defendant's employee rules and regulations. (DSOF ¶ 46-47). Thus, the undisputed evidence in the record demonstrates that Plaintiff violated company policies on numerous occasions. He has not offered any evidence suggesting otherwise and, therefore, cannot make a prima facie showing of discrimination. See Sengupta v. Morrison-Knudsen Co., 804 F.2d 1072, 1075 (9th Cir. 1986) (the plaintiff must prove that he was doing well enough to rule out the possibility that he was fired for inadequate job performance).

Even if Plaintiff could show that his gasoline purchases were business related, it would not affect the outcome of his claim. In rebutting such a prima facie case, Defendant would need only show that it had legitimate reasons for its actions. The focus of that inquiry is not on whether Defendant was *correct* in its determination that Plaintiff had repeatedly violated company policies, but on whether its determination was the real reason for Plaintiff's termination and not a pretext for discrimination. See Douglas v. Anderson, 656 F.2d 528, 533 (9th Cir. 1981). The evidence offered by Defendant of Plaintiff's credit card usage during times that he was not working demonstrates that Defendant based its decision to terminate on facts that it believed to be correct. In the absence of evidence to the contrary,

1 Plaintiff is unable to show that Defendant's reason for discharging him was merely a pretext
2 for discrimination.

3     Accordingly, Defendant's Motion for Summary Judgment is granted as to Plaintiff's
4 Title VII claim regarding his discharge.

5 **V.  Plaintiff's State Law Breach of Contract Claim**

6     Defendant moves for summary judgment on Plaintiff's breach of contract claim,
7 arguing that Plaintiff did not have an employment contract.  While the public policy in
8 Arizona renders all employment relationships "contractual in nature[,]" such "relationship[s]
9 [are] severable at the pleasure of either the employee or the employer" unless there is a
10 "signed written contract to the contrary."  A.R.S. § 23-1501(2).  Arizona law further provides
11 that "[a]n employee has a claim against an employer for termination of employment only
12 if...[t]he employer has terminated the employment relationship of an employee in breach of
13 an employment contract....in which case the remedies for breach are limited to the remedies
14 for a breach of contract."   A.R.S. § 23-1501(3).  As discussed, supra, Plaintiff signed an
15 acknowledgment that his employment with Defendant was at-will, and further testified that
16 no one at the company ever told him that Defendant would not terminate him unless certain
17 conditions existed.  (DSOF ¶ 45; Strong Dep. 32:3-6).  Thus, it is undisputed that Plaintiff
18 did not have an employment contract, and that his employment was at-will.  Plaintiff cannot
19 maintain a claim for breach of an employment contract that does not exist.[9]

20     Accordingly, Defendant's motion for summary judgment is granted with respect to
21 Plaintiff's breach of contract claim.

---

[9] Plaintiff has not presented any evidence that he signed an employment contract. Nor has Plaintiff tried to establish an enforceable contract by demonstrating that common law contract principles have been satisfied, i.e. that there has been "an offer, an acceptance, consideration and sufficient specification of terms so that the parties' obligations can be determined." Flory v. Silvercrest Indus., 129 Ariz. 574, 581, 633 P.2d 383, 390 (1981). Mutual assent of the parties is necessary, and requires that the offer be unequivocally accepted. Richards v. Simpson, 111 Ariz. 415, 417, 531 P.2d 538, 540 (1975).

- 14 -

## VI. Plaintiff's State Law Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendant moves for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. Defendant argues that a tort remedy is unavailable in employment cases such as this. Under Arizona law, claims for breach of the covenant of good faith and fair dealing arising out of breach of an employment agreement are only recognized when some public policy is violated. See Nelson v. Phoenix Resort Corp., 181 Ariz. 188, 198 (Ariz. Ct. App. 1994). Moreover, courts have continually refused to extend the "bad faith" tort recovery available in actions on insurance contracts to employment discharge claims. See e.g., Nelson, 181 Ariz. at 198; Foley v. Interactive Data Corp., 765 P.2d 373, 394-96 (Cal. 1988) (authorities cited therein). As discussed, supra, the undisputed evidence demonstrates that Defendant was not qualified for the position of Safety Coordinator, and violated company policy on numerous occasions, eventually leading to his discharge. Plaintiff does not point to any evidence in the record suggesting that a violation of public policy occurred. Thus, any damages for breach of the implied covenant of good faith and fair dealing would be limited to contract damages. As already discussed, Plaintiff's contract claim fails as a matter of law. Therefore, his claim for breach of the implied covenant of good faith and fair dealing must also fail.

Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

## VII. Plaintiff's State Law Claim for Wrongful Discharge

Defendant moves for summary judgment on Plaintiff's common law wrongful discharge claim, arguing that his exclusive remedy is provided by the Arizona Employment Protection Act, A.R.S. § 23-1501(3)(b) ("EPA"). Plaintiff's wrongful discharge claim incorporates by reference his prior allegations regarding discrimination. Plaintiff, however, does not cite a statute or otherwise inform the Court whether his wrongful discharge claim

- 15 -

is being brought under the EPA or as a common law claim. Nevertheless, the EPA provides that "[i]f the statute provides a remedy to an employee for a violation of the statute, the remedies provided to an employee for a violation of the statute are the exclusive remedies for the violation of the statute or the public policy set forth in or arising out of the statute, including" the Arizona Civil Rights Act ("ACRA") A.R.S. § 41-1401 et seq. See A.R.S. § 23-1501(3)(b). The ACRA provides essentially the same relief as Title VII, stating that "[i]t is an unlawful employment practice for an employer...[t]o fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions or privileges of employment because of the individual's race, color, religion, sex, age, disability or national origin." A.R.S. § 41-1463. Because the EPA provides a remedy, Plaintiff cannot maintain a common law wrongful discharge claim. Moreover, because the EPA and ACRA provide remedies akin to those provided by Title VII, Plaintiff's claims, if any, under those statutes would also fail for the same reasons discussed above.

Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's wrongful discharge claim.

**VIII. Plaintiff's State Law Claim for Intentional Infliction of Emotional Distress**

Defendant moves for summary judgment on Plaintiff's claim for intentional infliction of emotional distress ("IIED"), arguing that Defendant's conduct cannot support such a claim as a matter of law. To prevail on an IIED claim, Plaintiff must demonstrate: (1) that Defendant's conduct could be characterized as "extreme and outrageous"; (2) that Defendant either intended to cause or recklessly disregarded the near certainty that emotional distress would result from its conduct; and (3) that Defendant's conduct actually caused severe emotional distress. See Nelson, 181 Ariz. at 199. In assessing the first element, the Court must determine whether the conduct may be considered so outrageous and extreme as to be "atrocious" and "beyond all possible bounds of decency," such that it "would cause an average member of the community to believe it was "outrageous." Nelson, 181 Ariz. at 199.

- 16 -

1 That issue may only go to the jury where "reasonable minds may differ." Nelson, 181 Ariz.
2 at 199.

3 It is fairly well-established in the case law that termination of employment, whether
4 wrongful or not, will not rise to the level of extreme conduct sufficient to survive a motion
5 for summary judgment. See e.g., Nelson, 181 Ariz. at 199-200 (dismissing claim of
6 employee who was escorted out of premises in middle of night by armed security team;
7 allowed to use bathroom on way out only if accompanied into stall by armed escorts; fired
8 in lobby in front of coworkers and media; and prohibited from clearing personal effects out
9 of office); Mintz v. Bell Atlantic Systems Leasing, 183 Ariz. 550, 905 P.2d 559 (App. 1995)
10 (dismissing claim of plaintiff who was hospitalized for severe emotional problems following
11 denial of promotions at work; deprived of her disability benefits by employer; called back
12 to work early; and then fired in a letter delivered to her hospital bed); Lapidus v. New York
13 City Chapter of the New York State Ass'n for Retarded Children, Inc., 118 A.D.2d 122, 504
14 N.Y.S.2d 629, 633 (A.D. Dept. 1 1986) (plaintiff's "humiliation" at being "thrown out in the
15 middle of a working day and told not to go back to [his] office," coupled with information
16 rapidly spread among his peers about what was done to him, with resulting mental depression
17 and shock, not sufficient to state a claim for intentional infliction of emotional distress).

18 In this case, Plaintiff has not pointed to any evidence in the record demonstrating that
19 Defendant's conduct was so "extreme and outrageous" as to be beyond "all possible bounds
20 of decency." Nelson, 181 Ariz. at 199. Plaintiff is not fluent in Spanish, and therefore,
21 cannot show that he was qualified for the position of Safety Coordinator. Defendant's failure
22 to promote Plaintiff who was not qualified – if such a failure even occurred – is not an
23 extreme or outrageous act but a calculated business decision. Similarly, Defendant made a
24 business decision to discharge Plaintiff after it had learned of Plaintiff's numerous violations
25 of company policy. Based upon these undisputed facts, no reasonable minds could differ as
26 to whether or not Defendant's failure to promote Plaintiff and his subsequent discharge were
27 "extreme and outrageous" enough to support a claim for IIED. See Nelson, 181 Ariz. at 199.
28 Moreover, even assuming *arguendo* that Defendant's conduct could support an IIED claim,

1  Plaintiff has not pointed to any evidence in the record suggesting that he actually suffered
2  severe emotional distress, i.e. emotional distress that a "reasonable man could not be
3  expected to endure...." See Rest 2d of Torts, § 46.

4  Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's
5  claim for intentional infliction of emotional distress.

### IX.  Plaintiff's State Law Claim for Fraud, Deceit, and Misrepresentation

7  Defendant moves for summary judgment on Plaintiff's final claim for fraud, deceit, and
8  misrepresentation, arguing that this claim is based upon the same unsupported allegations as
9  Plaintiff's other claims.  To prove common law fraud, Plaintiff must establish: (1) a
10 representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or
11 ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the
12 manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's
13 reliance on its truth; (8) the right to rely on it; (9) the hearer's consequent and proximate
14 injury. Echols v. Beauty Built Homes, Inc., 132 Ariz. 498, 647 P.2d 629, 631 (Ariz. 1982);
15 Nielson v. Flashberg, 101 Ariz. 335, 419 P.2d 514 (Ariz. 1966).

16 Defendant argues that Plaintiff's fraud claim is based upon the same acts as his
17 discrimination claims, and therefore, it too should fail on summary judgment. Plaintiff's
18 complaint, however, alleges that the material misrepresentation constituting the fraud was
19 a misrepresentation by Defendant of the fact that Plaintiff would be "judged on the basis of
20 merit and ability," and that Plaintiff "would be given an opportunity to interview and be
21 evaluated for all the positions opening up on the Safety department." (Dkt. 4, ¶ 37). Further,
22 Plaintiff claims that Defendant "concealed facts from Plaintiff which Defendant had an
23 affirmative duty to disclose," and those facts were essentially "that Defendant would not
24 provide Plaintiff with an opportunity to be evaluated on a nondiscriminatory basis for transfer
25 for promotion." (Dkt. 4, ¶ 38).

26 While Plaintiff's lack of qualification for the Safety Coordinator position prevents him
27 from making a prima facie case under Title VII, Defendant concedes that a genuine issue of
28 fact exists regarding whether or not Plaintiff applied for the Safety Coordinator position. See

1 supra n.5. Even though that dispute is not material for purposes of Plaintiff's Title VII claim
2 – because even if he had applied for the position, he was not qualified – that dispute is not
3 clearly immaterial to Plaintiff's fraud claim. Though the contours of Plaintiff's fraud theory
4 are not well-defined, the Court must draw every inference in favor of the nonmoving party,
5 and will assume that Plaintiff's claim is based on Defendant's alleged failure to provide
6 Plaintiff with an opportunity to interview and be evaluated on a nondiscriminatory basis for
7 the Safety Coordinator position.  (Dkt. 4, ¶¶ 37-38).  If Defendant did not let Plaintiff
8 interview or evaluate him fairly after receiving an application from him, then Plaintiff's fraud
9 claim is colorable.  Thus, the dispute regarding whether or not Plaintiff actually submitted
10 an application for the Safety Coordinator position would appear to be material.  Nevertheless,
11 even assuming *arguendo* that Plaintiff could prove that he applied for the Safety Coordinator
12 position, and that he was not given an opportunity to interview or be evaluated fairly for the
13 position, Plaintiff cannot show that he suffered any damages because he was not qualified
14 for the position and would not have been hired even if his application had been evaluated
15 fairly.  See Echols v. Beauty Built Homes, Inc., 132 Ariz. 498, 647 P.2d 629, 631 (Ariz.
16 1982) (fraud plaintiff must show consequent and proximate injury).  Thus, Plaintiff cannot
17 prove a critical element of his fraud, deceit, and misrepresentation claim because the
18 undisputed facts demonstrate that he has no damages.

19      Accordingly, Defendant's motion for summary judgment on Plaintiff's fraud, deceit
20 and misrepresentation claim is granted.

21 **X.**    **Plaintiff's Cross-Motion for Summary Judgment and Motion to Appoint Counsel**
22      Because the Court grants Defendant's Motion for Summary Judgment in its entirety,
23 Plaintiff's Cross-Motion for Summary Judgment is denied.  The Court will also deny
24 Plaintiff's Motion to Appoint counsel because none of Plaintiff's claims survive summary
25 judgment.

26      Accordingly,
27      **IT IS ORDERED THAT:**
28           (1) Defendant's Motion for Summary Judgment (Dkt. 21) is **granted**.

1  (2) Plaintiff's Cross-Motion for Summary Judgment (Dkts. 35, 36) is **denied**.
2  (3) Plaintiff's Motion to Appoint Counsel (Dkt. 31) is **denied**.
3  (4) The Clerk shall enter a judgment terminating this action.
4  DATED this 19th day of August, 2007.

*Earl H. Carroll*
Earl H. Carroll
United States District Judge

- 20 -